ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
v. OSBORNE.

Opinion delivered May 16, 1910.

1. DAMAGES FOR PERSONAL INJURIES—WHEN NOT EXCESSIVE.—Where the testimony in a personal injury suit tended to prove that by reason of defendant's negligence plaintiff suffered serious and permanent physical injuries described as traumatic neurasthenia and affecting his entire nervous system, whereby his capacity to earn a livelihood was greatly impaired and his chance of recovery rendered doubtful, a verdict awarding $16,000 as damages was not excessive. (Page 315.)

2. CARRIERS—INJURY TO PASSENGERS—PRESUMPTION.—Where a passenger is proved to have received injuries in a collision, the presumption arises that the carrier was negligent. (Page 315.)

3. EVIDENCE—PERSONAL INJURIES.—In a personal injury suit it was not error to permit the plaintiff, a merchant, to testify that since he was injured he has been unable to attend to business; that he spent most of his time around home and in bed; that he was pessimistic, and lacked patience in waiting on customers, and that in consequence he had lost trade, and his business had ceased to be profitable. (Page 316.)

4. APPEAL AND ERROR—INVITED ERROR.—Where the defendant in a personal damage suit on plaintiff's cross examination brought out the fact that plaintiff had recently taken advantage of the bankrupt law, it can not complain because plaintiff on re-examination was

permitted to testify that since he was discharged in bankruptcy he had, under a sense of moral obligation, paid a considerable portion of the discharged debts. (Page 316.)

5. EVIDENCE—NONEXPERT WITNESS.—Nonexpert witnesses may testify in a personal injury suit as to the plaintiff's physical condition before and after the alleged injury.. (Page 317.)

6. APPEAL AND ERROR—HARMLESS ERROR.—One of the physicians who treated the plaintiff at his sanitarium testified that two local men of prominence were then patients in his sanitarium. Counsel for plaintiff argued that the patronage of these men was a certificate of the physician's good reputation. The latter's reputation was not questioned in the trial. *Held,* that the evidence and argument were not prejudicial. (Page 317.)

7. EVIDENCE—PROOF OF DEMEANOR OF WITNESS.—It was not error to refuse to permit a witness to prove the plaintiff's demeanor and appearance while on the witness stand, as the jurors could observe that for themselves. (Page 318.)

Appeal from Jackson Circuit Court; *Charles Coffin,* Judge; affirmed.

*W. E. Hemingway, E. B. Kinsworthy, James H. Stevenson* and *S. D. Campbell,* for appellant.

Appellee's testimony was incompetent, unreliable, and uncertain. 88 N. E. 1063; 121 Ky. 526; 123 Am. St. R. 205; 90 Ky. 369; 29 Am. St. R. 378; 27 S. W. 999; 119 N. W. 200; *Id.* 1061. Instruction number one requested by appellee was erroneous. 30 Ark. 362; 51 Ark. 88; 91 Am. Dec. 309; 55 Ark. 393; 57 Ark. 203; 25 Ark. 490. It must appear to this court that error and misconduct in the argument of counsel was harmless, otherwise the case will be reversed. 58 Ark. 368; *Id.* 473; 61 Ark. 130; 63 Ark. 176; 69 Ark. 486; 65 Ark. 625; 70 Ark. 305; 72 Ark. 427. The verdict was the result of passion and prejudice, and is excessive. 57 Ark. 402; 194 Mo. 367; 178 Mo. 134; 113 Mo. App. 640; 27 S. W. 999; 101 Minn. 40; 100 Minn. 236; 82 Minn. 123.

*Joseph W. Phillips, W. V. Tompkins* and *John W. & Joseph M. Stayton,* for appellee.

Where injuries are permanent, mortality tables can be shown. 63 Ark. 491; 76 Ark. 233; 80 Ark. 551; 88 Ark. 229; 13 Cyc. 198. Carriers of passengers by steam are held to the highest degree of care. 34 Ark. 613; 40 Ark. 298; 51 Ark. 459; 57 Ark.

418; 59 Ark. 180; 60 Ark. 550. When an instruction is objected to, the vice must be pointed out. 87 Ark. 454. As to the meaning of the word "permanent," see 20 N. Y. S. 157; 65 Hun 94; 33 Atl. 399; 53 N. J. Eq. 370; 51 Am. St. 628; 2 N. J. Eq. 154; 26 S. E. 703; 120 N. C. 498; 9 App. Cas. (D. C.) 435; 69 Wis. 315; 187 Pa. St. 333; 15 L. R. A. 579. Appellate courts are little inclined to interfere on the ground of excessive damages where it appears the injury is permanent. 56 Ark. 594; 48 Ark. 396; 13 Cyc. 132, 133, 139, 129.

McCulloch, C. J. Plaintiff, Wm. F. Osborne, was a passenger on one of the passenger trains of the defendant, which collided with a freight train about a mile distant from the city of Little Rock on the first day of October, 1907, and he sues to recover damages on account of physical injuries alleged to have resulted from the collision. Negligence of defendant's servants is alleged to have caused the collision.

Plaintiff took passage on the train at Gurdon, Arkansas, where he resided; Little Rock being his destination. Just as the train reached the outskirts of this city, it ran into the caboose of a freight train. Plaintiff was sitting in the smoking car at the time, and was, by the force of the shock, thrown and pitched forward so that his head and shoulder hit against the back or arm of the seat. He describes his injury in the following language:

"I fell sideways, and struck my left shoulder right back there (indicating), as well as I have been able to ascertain from the soreness on that part. When that seat was thrown over, there was an exposed part that comes over, and my head hit on that, and left shoulder. Back part of head, back of my ear, struck this part of seat (indicating) and back of my neck; then got up feeling stunned and dazed; was confused; had pain in the back of my neck at two places a short distance apart, just a few seconds after I got to my seat. The pain was very acute and sharp, like there had been a sprain or wrenching of head and neck." He described his sensation immediately after receiving the injury as that of fullness in the chest, which continued, and pain in the shoulder, neck and head, and dizziness; couldn't hold his head up; "head seemed to go forward."

He walked up to the station, and took a car up town, where he got lunch, and then went to a hotel and retired for the night,

but couldn't sleep. The next day he attended to some business in Little Rock, and took the train for Newport, Ark., where he was engaged in business. The next night he suffered considerable pain in his head and shoulder, and consulted a physician. He continued his attention to business, but in a few days took suddenly sick and called in physicians. He was under treatment of physicians almost continuously from the date of his injury up to the time of the trial, which occurred February 20, 1909. He remained at Newport under the treatment of physicians until October 13, 1907, when he returned to his home at Gurdon, and was there treated by his regular physician until December 20, 1907, when the latter died. He was also treated by several physicians in Little Rock at different times, and spent considerable time in a sanitorium, but has never recovered. He described his physical condition at the time of the trial as follows: "Before accident I was a pretty good mixer with my fellow man, enjoying a joke, and weighed about 220 pounds, and wasn't irritable; went down to about 200 pounds; now I am easily worried; can't stand any sharp noises; remember instances at Gurdon, my place of business being near the railroad, the blowing of whistles would affect me considerably; shooting of firecrackers makes me nervous and irritable; have very little to do with anybody on account of my affliction, and that is the first thing I want to talk about; I have a number of small children at home, and have to stay away from them on account of the noise; light affects my eyes, and I keep my room darkened; don't read anything but newspapers, and then only fifteen or twenty minutes at a time; don't sleep well; am nervous; something will get on my mind, and I can't shut it out, and the next morning usually feel tired; can't walk but a short distance now; week or two after getting hurt I had a very acute pain that seemed to be where I believe the base of the brain is; couldn't move my head, and couldn't stand a jar; my walking was retarded perhaps soon afterwards, but I got worse three or four months after I was hurt; walk with difficulty, and have had to carry a cane about twelve months; my back hurts me, and walking increases it; have very severe scalding pain, burning pain, in my head, but the trouble seems to be a strain or tearing or some dislocation in the neck.. This bothers me the most. At times my hands and feet are cold and clammy; hands are

numb, and have lost my grip; can think for only a limited time without becoming tired; can't work any, and haven't worked much since fourteen months ago; reading increases trouble; have spots before my eyes; when I stand straight up and close my eyes, have a falling sensation; have to use a cane; my appetite is fair at times; have taken a great deal of tonic; have to have specially prepared food now, and for that reason eat at a restaurant; suffer some from dyspepsia and indigestion; can't stand excitement; have sweating of the hands. I have been in the hardware and furniture business at Gurdon for a number of years; very small business now, less than it was a year ago when I had a stock of about $3,500. I am closing the furniture out of my Gurdon store. It was hardware and furniture at the time of the accident, and I had two clerks then; have only one now; have not been able to conduct that business as it was at time of accident, but have kept it open; can not think connectedly. Since the accident have been able to give my business very little attention. I have spent about one-half my time in bed around home, and the greater part of the time I did spend around my business I spent on a cot in my store; got a cot in each of my stores on which I spent most of the time while I was in my places of business." ·

Three physicians, who treated plaintiff, were introduced as witnesses, and the testimony of each tended to substantiate his claim that he had sustained serious injury. Each stated his opinion concerning plaintiff's condition, and the extent of the injury which he claimed to have received. They diagnosed the trouble as traumatic neurasthenia, that is to say, weakness of the nerves caused or aggravated by a wound or physical shock or injury, and they gave opinions that the disease is generally, but not certainly, curable; that recovery is uncertain and always doubtful, even under favorable conditions. They said that plaintiff's condition had constantly grown worse since they knew of the case. Eminent medical text writers are quoted to the effect that in a majority of cases of traumatic neurasthenia or hysteria, the patient recovers, but that some do not recover, the disease persisting "until psychoses develop, such as melancholia, dementia, or occasionally progressive paresis." The physicians who examined plaintiff did not find any cuts, bruises or other external signs of injury on his body, but medical authorities

seem to agree that the disease may be produced by the shock of a railway accident, without there being any external signs of the injury.

Defendant introduced considerable testimony, experts and others, rebutting the plaintiff's claim. It undertook to show that plaintiff had received no substantial injury at all, but was shamming or feigning injury—malingering, as the medical men term it. People living in the same town with plaintiff testified that he would appear to walk and otherwise deport himself as a perfectly well man when he thought he was unobserved, but that when he saw any one watching he would assume an attitude of suffering and physical disability. A physician who examined him at defendant's instance testified that he found nothing the matter with him. But the testimony was conflicting, and that introduced by plaintiff was sufficient to warrant a finding that he was severely injured, and that the injury resulted from the collision while he was a passenger on the train.

The trial jury returned a verdict in plaintiff's favor, and assessed his damages at the sum of $16,000, which is alleged to be excessive. We are of the opinion, however, that, if full credit be given to all of plaintiff's witnesses, as the jury had the right to do, the verdict is not excessive. Plaintiff is, according to the testimony, seriously injured, and his recovery is doubtful. It is not greatly improbable that his condition will grow worse. He suffers constant pain, and his capacity to earn a livelihood is considerably impaired, if not entirely destroyed. If his condition is such as that described by him and his witnesses, his life is ruined, though yet a young man, so far as comfort and enjoyment is concerned. We are unwilling to say that under those circumstances the verdict is excessive.

It is undisputed that the collision occurred, and that plaintiff was a passenger. No attempt was made by defendant to exculpate itself from the charge of negligence; so, if the plaintiff's injuries are proved to have resulted from the collision, the presumption of negligence arises and fixes defendant's liability. As to negligence, the occurrence speaks for itself. Assignments of error in the giving of instructions on the degree of care which a carrier owes to passengers need not, therefore, be considered, for, according to the undisputed evidence, the defendant is responsible for any injuries which plaintiff received

in the collision, and no error in the instructions on that point could have been prejudicial.

Numerous errors of the court are assigned in admitting testimony adduced by plaintiff. The first is as to plaintiff's own testimony. He was allowed to testify, over the defendant's objection, that since he was injured he had been unable, on account thereof, to give attention to his business; that he spent most of the time around home and in bed; that he was pessimistic, and lacked patience in waiting on customers, and that in consequence of these things he had lost his trade, and that his business had ceased to be profitable. We see no reason why these matters were not proper to prove. They came within the allegations of the complaint as to the nature, extent. and result of his injuries. It was necessary to show these things in order to prove the amount of his damages.

It is especially urged that an error was committed in permitting plaintiff to say that he was pessimistic since he received the injury, and took a gloomy view of life; thus, it is claimed, passing on his own disposition and stating a conclusion. Who can state the feeling and changed disposition better than one's own self? These are things from which the jury is left to draw conclusions in the light of the other testimony, the jury being, of course, the judges of its weight.

Objection is also made that the court permitted plaintiff to testify that since he was discharged in bankruptcy he had, under a sense of moral obligation, paid a considerable portion of the discharged debts. This testimony was brought out on re-direct examination, after defendant's counsel had drawn from him on cross examination the statement that he had taken advantage of the bankrupt law in the year 1905, which was two years before he received the jury. If error was committed, it was invited by defendant in entering upon this subject in the examination of the plaintiff. The fact that plaintiff had, prior to the injury, taken advantage of the bankrupt law had no legitimate place in the case, and its only effect was to degrade plaintiff before the jury by showing that he was either unable or unwilling to pay his debts, and defendant can not complain that plaintiff was allowed to rebut this by showing that he paid the debts, notwithstanding the discharge in bankruptcy.

Nonexpert witnesses were permitted, over defendant's objection, to testify as to plaintiff's physical condition before and after the date of the alleged injury. The objection is based on the fact that the witnesses were not experts. They did not profess to be experts, but were allowed to state facts within their knowledge and observation as to plaintiff's physical condition, habits, etc. This was proper.

One of the physicians introduced by plaintiff as a witness, and who treated plaintiff in his sanatorium in the city of Little Rock, testified that two local men of prominence in Newport, Ark., where the case was tried, were then patients in his sanatorium at the time of the trial. This is assigned as error, and it is contended that its prejudicial effect was emphasized by a statement of counsel for plaintiff in his closing argument in substance that the patronage of those gentlemen was a certificate of the physician's good reputation, qualifications, etc. This physician's reputation and professional standing were not questioned, and we can not see how the testimony or the statement of counsel could have had any effect either one way or the other.

There are several other assignments of error in admitting improper testimony, but they are not of sufficient importance to discuss.

Another assignment of error is as to the refusal of the court to permit Dr. R. C. Dorr to answer certain questions eliciting his opinion concerning plaintiff's conduct and appearance while on the witness stand. Dr. Dorr had never examined the plaintiff, and was not personally acquainted with him, but saw him on the witness stand and heard him testify. He (Dr. Dorr) testified as an expert in the case as to the causes, effects, etc., of traumatic neurasthenia. Defendant's counsel offered to propound to him the following questions:

"Doctor, did you observe Mr. Osborne while he was here the past week in attendance upon the court, and while he was on the witness stand?

"And did you observe his manner of testifying on cross examination, and observe any difference as to his demeanor upon the witness stand while he was being cross examined?"

The court refused to allow the questions, and counsel then made the following statement as to what was expected to be

proved: "It is expected by the defendant that the witness will testify that he has observed the difference between the plaintiff's demeanor on the witness stand on direct examination and on cross examination, and that while the plaintiff, Osborne, was on the witness stand he held his head downward, frequently passed his hand over his eyes and drooped his eyes, and that on cross examination he straightened up, became apparently more interested and ceased bowing his head, and ceased throwing his hand over his eyes, and ceased drooping his eyes—that question is a foundation, and the defendant proposes to then propound to witness the following question."

The following question was also offered and disallowed:

"Would this manner and conduct, which you have observed in the witness, be an indication of impaired memory or lack of concentration, and what have you to say as to it being an indication, from a medical standpoint, as to malingering?" And counsel made the following statement: "It is expected by defendant that the witness will testify that such manner and conduct indicates no impaired memory and no lack of concentration, but indicates that plaintiff is malingering."

The contention is, in support of these assignments of error, that defendant had the right to have Dr. Dorr state his opinion, based on his observation of the plaintiff while on the witness stand, to the effect that plaintiff was malingering or shamming, and was not a sufferer from neurasthenia. In another part of this witness' testimony he was permitted to state that he had observed the plaintiff for five hours while the latter was on the witness stand, and that from such observation he had discovered nothing to indicate any loss of memory or lack of concentration of ideas on the part of plaintiff, and that plaintiff's capacity in this regard, as indicated by his appearance and demeanor on the witness stand, was free of defects and about the same as that of any other average man.

So it is seen that defendant was allowed to prove everything by this witness that he attempted to prove except the description of the plaintiff's demeanor and appearance while on the witness stand. This, of course, was not competent, for the jurors observed this as clearly as the doctor did. The latter as an expert could, at most, be permitted to give his opinion as to what the conduct indicated, and he was permitted to do

that. The question whether or not plaintiff was, in the opinion
of the doctor, a malingerer, is settled by a subsequent statement
of Dr. Dorr, made on cross examination. He stated that he
had not examined plaintiff, and could not attempt a diagnosis
of his particular case.

Objection is made to that part of an instruction on the
measure of damages which submits the question of damages for
permanent injury. It is insisted that the evidence did not war-
rant a finding of the existence of a permanent injury, but we
conclude that there was sufficient evidence to warrant such find-
ing, and that the question was properly submitted. The ex-
perts who testified as to the prognosis of plaintiff's case did not
say positively that the injury is permanent, but they do state
that his chances of recovery are very doubtful and uncertain,
and that he is growing worse all the time, instead of improving.

Error of the court is assigned in modifying the defendant's
questions to be propounded to the jury for special finding there-
on, but we are of the opinion that the modifications were within
the pleadings and proof in the case, and that they were not er-
roneous.

Judgment affirmed.